UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| RONILDA C. HENSON, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 1:18-CV-174 |
| | § | |
| TEXAS SOUTHMOST COLLEGE DISTRICT, | § | |
| | § | |
| Defendant. | § | |
| | § | |

## OPINION AND ORDER

After Defendant Texas Southmost College (TSC) did not renew Plaintiff Dr. Ronilda C. Henson's employment contract with the institution, she filed this Title VII lawsuit alleging that due to her race and national origin, TSC discriminated against her and created a hostile work environment, and then retaliated when she filed a grievance. TSC moves for summary judgment as to all causes of action. (Motion, Doc. 22) For the following reasons, the Court finds the Motion well taken.

### I. Factual Background and Procedural History

In January 2016, TSC hired Henson as a professor in the Child Development and Early Childhood (CDEC) program. (Motion, Doc. 22, ¶ 4; Compl., Doc. 1, ¶ 9) Throughout her employment with TSC, "Dr. Henson was the only Filipina in the CDEC program" and most of her colleagues and supervisors were "Hispanic females". (TSC Inv. Report, Doc. 22-26, 3 (noting that Henson was "supervised by a group of Hispanic, female employees")) TSC initially hired Henson to complete the remaining five months (January—May 2016) of a 9-month faculty appointment, and then renewed her appointment twice (August 2016—May 2017 and August 2017—May 2018). (April 2016 Letter of Employment, Doc. 22-8; April 2017 Letter of Employment, Doc. 22-9)

In April 2017, Henson met with acting CDEC Department Chair, Beatriz Castillo, to

discuss a number of complaints that students had filed against Henson. (May 2017 Memo, Doc. 22-10, 1) These complaints included that Henson changed her syllabus multiple times, gave ineffective instruction and last-minute assignments, and did not return graded assignments or lesson plans in a timely manner. (*Id.*; Spring 2017 Student Complaints, Doc. 22-11) Students also objected to Henson's request that they only speak English, and not Spanish, while in her class. (May 2017 Memo, Doc. 22-10, 1; Henson Dep., Doc. 22-5, 71:5–71:22 (explaining that her English-only classroom policy is for the purpose of teaching professionalism)) After meeting with Henson, Castillo provided Henson a memo detailing the student complaints. (May 2017 Memo, Doc. 22-10)

In October 2017, acting Dean Dr. Deborah Huerta issued Henson a "Notice of Warning— Poor Work Performance". (Doc. 22-13) In this Notice, Huerta advised Henson that several students had reported "difficulties they are currently experiencing in your course(s)." (*Id.* at 1) The Notice explained that the students' concerns were "the same complaints that were voiced during the Spring 2017 semester." (*Id.* (including that Henson did not post grades in a timely manner, issued grades difficult to understand or calculate, and did not follow the course schedule and syllabus)) The Notice concluded by identifying four "directives" that TSC "expected" Henson to follow, or else face "disciplinary action up to and including termination." (*Id.* at 2)

About two weeks after receiving the Notice, Henson submitted a written response, disputing the complaints made against her. (Appeal Against Warning, Doc. 22-15) Henson presented her perspective of her discussions with Castillo in the spring of 2017, and her belief that the complaints had been resolved satisfactorily. Henson requested a meeting with Huerta to "formally discuss" the issues. (*Id.* at 4) In her Appeal, Henson did not suggest that she had suffered any hostility or unfair treatment based on her race or ethnicity. (Henson Dep., Doc. 22-5, 86:14–86:19)

In January 2018, Sonia Treviño, acting Chair of the TSC Behavioral and Social Sciences Department, issued Henson a "Memo of Concerns", explaining that the CDEC program suffered from a lack of communication and collaboration "with both faculty members", which had led to several enumerated challenges. (Jan. 2018 Memo, Doc. 22-16 (including, as some of the identified challenges, student complaints, scheduling problems, and mixed messages to students and other departments)) Treviño requested that the CDEC faculty prepare and implement a departmental Program Improvement Plan (CDEC PIP). (*Id.*) After receiving the January 2018 Memo, Henson began working with her CDEC colleague, Leticia Diaz, to create and submit the CDEC PIP. (CDEC PIP, Doc. 22-17)

The next month, Huerta issued Henson a "Notice of Warning—Unprofessional Conduct & Poor Work Performance". (Doc. 22-18) In this document, Huerta explained that two students had recently raised concerns with Treviño about Henson's unclear course requirements and scheduling changes. (*Id.* at 1) In addition, Huerta highlighted that the "lack of team work and collegiality" between Henson and Diaz was "continuing to create programmatic issues." (*Id.*) The February 2018 Notice included several remediation steps that TSC expected Henson to undertake, including copying Treviño "on all work-related emails beginning today". (*Id.*) Simultaneous with providing the February 2018 Notice, TSC placed both Henson and Diaz on individual Performance Improvement Plans. (Henson PIP, Doc. 22-19; Diaz PIP, Doc. 23-1)

In late February, Henson submitted her "Response" to the February 2018 Notice. (Doc. 22-20) Henson responded in some detail to the raised concerns, defending her job performance and indicating that Diaz's attitude and actions were causing most of the difficulties within the department. (*Id.* at 2–3) She expressed that she had developed a "point of view" that "there may be unfair distinctions among faculty (primarily Ms. Diaz and myself)." (*Id.* at 3) She explained that while she had defended herself on more than one occasion, she believed the college was responding to her "not on the basis of merit, but on the basis of some other

attitude." (*Id.*)  She did not provide details regarding this belief, and requested a follow up meeting to "formally discuss this matter". (*Id.*)

The issues between Henson and TSC came to a head in May 2018.  On May 2, Huerta received a Faculty Action Recommendation form for her consideration.  (Faculty Action Form, Doc. 26-4; Huerta Dep., Doc. 26-2, 34:25–35:25  ("If I remember 5-2 is the date that I received the document."))   On May 8th and 10th of 2018, Henson met with Huerta and Treviño to discuss her progress in completing her individual PIP and the CDEC PIP. (Huerta Aff., Doc. 22-3, ¶ 3; Treviño Aff., Doc. 22-2, ¶ 3 )  After the May 10th meeting, Huerta and Treviño concluded that Henson had failed to successfully complete both the CDEC PIP and the individual PIP. (Huerta Aff., Doc. 22-3, ¶ 3; Treviño Aff., Doc. 22-2, ¶ 3; Frausto Aff., Doc. 22-6, ¶ 6)

On May 11, Henson filed a Grievance Complaint with TSC expressly alleging discriminatory conduct: "Over the past year, Dr. Huerta and Ms. Trevino have engaged in a pattern of discriminatory and hostile conduct towards [her] that has created a hostile working environment." (Grievance Compl., Doc. 26-5, 2)   In the document, Henson expressed her disagreement with the allegations against her of poor job performance, and claimed that she "ha[d] been isolated from her Hispanic peers and treated with disdain and general lack of respect." (Grievance Compl., Doc. 26-5, 3)  She indicated that she had filed the complaint after receiving "her performance review for the 2018 academic school year" and "the final determination of her completion of the PIP" on May 9 and 10, respectively.  (*Id.* at 4)   She explained that these decisions had placed her "in extreme apprehension of a future negative employment decision."  (*Id.*)

On May 12, Henson's contract with TSC expired by its own terms.  (April 2017 Letter of Employment, Doc. 22-9 (referencing contract term as "August 21, 2017 to May 12, 2018"))

Ten days later, Huerta "signed off" on the Faculty Action Recommendation Form, recommending the non-renewal of Henson's contract. (Faculty Action Form, Doc. 26-4 (dated

May 4, signed May 22); Huerta Dep., Doc. 26-2, 34:25–35:25)) Huerta testified at her deposition that when she recommended the non-renewal of Henson's contract, she (Huerta) was unaware of Henson's Grievance Complaint. (Huerta Dep., Doc. 27-1, 43:14–43:25) Huerta submitted the recommendation to TSC's Vice President of Instruction, Dr. Kile. (Huerta Dep., Doc. 26-2, 35:20–35:21; Huerta Affidavit, Doc. 22-3, ¶ 3)

After Henson filed her Grievance Complaint, TSC's Director of Campus Safety and Conflict Resolution, Jeff Jens, initiated an investigation into the allegations. (TSC Inv. Report, Doc. 22-26) On June 18, he completed his investigation, finding that the complaint was unsubstantiated. (Frausto Aff., 22-6, ¶ 8; TSC Inv. Report, Doc. 22-26) It appears that the Board of Trustees did not immediately receive Jens's findings, as on June 21, the Board decided to abate consideration of Henson's contract for the 2018-2019 school year "during the investigation" of her discrimination complaint. (Frausto Aff., 22-6, ¶ 9)

On July 2, the Board reached the issue of Henson's contract and "took no action to offer her a new contract", effectively deciding to not renew her employment. (*Id.*) Four days later, TSC mailed Henson written, formal notice of the Board's decision. (*Id.*)

On July 9, Henson filed a complaint with the Equal Employment Opportunity Commission, which ultimately found no violation of Title VII. (*Id.* at ¶ 10; EEOC Compl., Doc. 26-6).

In October 2018, Henson filed this lawsuit, alleging that she was "subjected to a pervasive hostile and discriminatory working environment by her co-workers and superiors alike based on her race and national origin." (Complaint, Doc. 1, ¶ 9) She alleges that she was treated disparately from her Hispanic colleagues because her supervisors: (1) provided comparatively less resources and support for the community events she organized; (2) declined to provide funding for her to attend an international conference (while another Hispanic colleague received funding); and (3) "failed or refused to provide feedback . . . on how to

improve her performance with her peers and students". (*Id.* at ¶ 10) Henson also alleges that many of the "areas of concern" and student complaints lodged against her were "unsubstantiated" and "not based on any evidence". (*Id.* at ¶ 11) Henson alleges that, "[u]nlike her Hispanic colleagues, [she] was not counseled or provided any guidance regarding any specific improvements or the steps she needed to take to overcome the issues identified in her PIP". (*Id.* at ¶ 12) And she alleges that she "was criticized and treated with disdain after requesting that her colleagues and students speak in English in her presence rather than Spanish so that she could understand and participate in the conversation." (*Id.* at ¶ 10)

In November 2019, TSC filed its Motion for Summary Judgement. (Motion, Doc. 22)

## II. Analysis

Title VII makes it unlawful for an employer to discharge an employee because of her "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a), *et seq*. Based on Section 703 of Title VII, Henson advances claims of race-based discrimination, hostile work environment, and retaliation.[1] (Complaint, Doc. 1, ¶¶ 18, 24;)

In its Motion for Summary Judgment, TSC argues that each claim fails as a matter of law because Henson cannot establish a *prima facie* case as to any cause of action. (Motion, Doc. 22, ¶ 15) TSC also contends that, even if Henson could establish a *prima facie* case of discrimination under any theory, the summary judgment evidence demonstrates legitimate, nondiscriminatory reasons for "placing her on a PIP and subsequently non-renewing her employment when she failed to successfully complete the PIP". (*Id.* (citing issues of "numerous student complaints, inability to collaborate with colleagues, lack of communication, and poor work performance")) This evidence, according to TSC, precludes any genuine issue of a material fact and warrants summary dismissal of Henson's causes of action.

---

[1] In her Complaint, Henson enumerates only two causes of action, for "Discrimination in Violation of Title VII" and "Retaliation in Violation of Title VII." (Compl., Doc. 1, 6-7) But both parties accept that Henson's discrimination claim includes distinct causes of action for disparate treatment and for a hostile work environment. (Motion, Doc. 22, ¶¶ 22, 30–34; Response, Doc. 26, ¶¶ 10, 15) Accordingly, the Court will address the three legal theories.

## A. Standard of Review

Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, shows that no genuine dispute of material fact exists, and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). A genuine dispute over material facts exists if the evidence presents an issue "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party," and the fact at issue might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.* 47 U.S. 242, 248, 250 (1986). The moving party "bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–25 (1986)). All facts and inferences drawn from those facts must be viewed in the light most favorable to the nonmovant. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

If this evidence is provided, the burden then shifts to the responding party to present affirmative evidence to defeat the motion. *Anderson,* 477 U.S. at 257. "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan Worldwide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998) (citing *Anderson*, 477 U.S. at 255–57). "Unsubstantiated assertions, improbable inferences, and unsupported speculation, however, are not sufficient to defeat a motion for summary judgment." *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003) (internal quotation marks omitted).

## B. Discrimination Claim

Title VII prohibits discrimination "against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Generally, to maintain a

claim under Title VII, a plaintiff must demonstrate a *prima facie* case of discrimination. *See Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To meet this initial burden, "the plaintiff must either present direct evidence of discrimination or, in the absence of direct evidence, rely on circumstantial evidence using the *McDonnell Douglas* burden shifting analysis." *Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 332 (5th Cir. 2019). When the plaintiff alleges that she was discharged or otherwise treated discriminatorily by her employer, the plaintiff must show that (1) she is a member of a protected class, (2) she was qualified for the position, (3) she suffered an adverse employment action, and (4) others similarly situated were more favorably treated or that the plaintiff was replaced by someone outside the protected class. *See Willis v. Coca Cola Enters., Inc.*, 445 F.3d 413, 420 (5th Cir. 2006).[2]

If a plaintiff establishes a *prima facie* case, an inference of discrimination arises, and the burden shifts to the defendant to present evidence that the adverse employment action was taken for a legitimate, nondiscriminatory reason. *Rutherford v. Harris Cty., Tex.*, 197 F.3d 173, 180 (5th Cir. 1999). Once an employer articulates a legitimate, nondiscriminatory reason and produces competent summary judgment evidence in support of that stated reason, the inference of discrimination disappears, and the burden of proof shifts back to the plaintiff to demonstrate that the employer's articulated reason for the adverse employment action was merely a pretext. *Id.* at 180.

### 1. Adverse Employment Action

"Adverse employment actions consist of 'ultimate employment decisions' such as hiring, firing, demoting, promoting, granting leave, and compensating." *Thompson v. City of Waco, Texas*, 764 F.3d 500, 503 (5th Cir. 2014) (quoting *McCoy v. City of Shreveport*, 492 F.3d 551, 560 (5th Cir. 2007)). Conversely, "an employment action that does not affect job duties,

---

[2] TSC does not contest that Henson is a member of a protected class or that she was qualified for her position at the college.

compensation, or benefits is not an adverse employment action." *Id.* (internal quotation marks and alterations omitted). "[A]llegations of unpleasant work meetings, verbal reprimands, improper work requests, and unfair treatment do not constitute actionable adverse employment actions as discrimination or retaliation." *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 826 (5th Cir. 2019); *see also King v. Louisiana*, 294 F. App'x 77, 84 (5th Cir. 2008) ("Our discrimination jurisprudence has held that poor performance evaluations, unjust criticism, and being placed on probation do not constitute 'ultimate employment decisions.'") (quoting *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007)).

Henson alleges several adverse employment actions, including TSC's refusal to renew her employment contract, supervisor reprimands, unequal travel funding and support, a lack of feedback and instruction regarding her individual PIP, and criticism by faculty members. (Complaint, Doc. 1, ¶¶ 9–10; Response, Doc. 26, ¶ 10)  Of these, the only allegation that represents a recognized adverse employment action is the nonrenewal of her contract. As a result, Henson can base her discrimination claim solely on TSC's decision to not renew her contract.

### 2. Disparate Treatment

To satisfy element four of a *prima facie* case, Henson must show that, with respect to TSC's nonrenewal of her contract, similarly situated employees outside of her protected class received disparate treatment under "nearly identical circumstances." *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009). In the Fifth Circuit, "nearly identical circumstances [are found] when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Id.*  "Nearly identical" is not synonymous with "identical". *Id.*

In the present matter, Henson argues that TSC instructors Leticia Diaz and Diana Castro

were both similarly situated to her and treated more favorably. (Response, Doc. 26, ¶ 10) As to Diaz, the summary judgement evidence demonstrates that she was similarly situated to Henson. During the relevant time period, Diaz, who is Hispanic, was Henson's sole colleague in the CDEC program. They shared supervisors and held similar responsibilities. They also experienced comparable violation histories.

But having found Diaz and Henson similarly situated, the Court finds that the summary judgment evidence conclusively establishes that TSC did not treat them disparately. By early 2018, supervisors voiced concerns about Diaz and Henson's job performance. TSC placed both women on individual PIPs, and jointly placed them on the CDEC PIP.[3] In Spring 2018, Huerta, who supervised both Henson and Diaz, concluded that both women had not successfully completed either their individual PIP or the CDEC PIP. Huerta recommended that TSC not renew either woman's contract. (Huerta Aff., Doc. 22-3, ¶ 3; Faculty Action Form, Doc. 26-4) TSC agreed with the recommendation as to both women. (Frausto Aff., Doc. 22-6, ¶ 2) In short, TSC treated Henson and Diaz identically with respect to the alleged adverse employment decision—i.e., the nonrenewal of an employment contract. Based on this uncontroverted summary judgment evidence, Henson fails to create a genuine issue of material fact regarding whether TSC treated Henson disparately as compared to Diaz.

Henson also identifies Castro, "another Hispanic instructor in the humanities department", as a similarly situated employee who TSC treated disparately. But this argument also fails. Like Henson, Castro was an instructor at TSC, although she was not within the CDEC program. (Henson Dep., Doc. 22-5, 102:20–104:20) Assuming that two instructors in the same department have similar responsibilities, the summary judgment record is silent as to Castro's job-performance record, or whether TSC renewed her contract. As a result, the Court finds the summary judgment evidence wholly inadequate to show that TSC treated Castro more favorably

---

[3] At the time, Henson remained unaware that TSC had placed Diaz on an individual PIP. (TSC Inv. Report, Doc. 22-26, 4) ("Henson would not have been aware of any Personal Improvement Plan given to Ms. Diaz as these are considered confidential and are only shared between Human Resources, the Employee, and issuing supervisor.")

with respect to the alleged adverse employment decision at issue—i.e., the renewal of an employment agreement. Henson fails to meet the elements of a *prima facie* case as to Castro.

Henson provides evidence that Huerta approved Castro's request for funding to travel and present at an international conference, while denying "Henson's request for additional funding" to attend the same conference. (Response, Doc. 26, ¶ 10) But this fact, accepting it as true, does not bear on the relevant adverse employment action, and cannot on its own create a *prima facie* case for disparate treatment. In addition, TSC submits evidence that at the time of the international conference at issue, Castro "had available money in her travel budget, while Dr. Henson had exceeded her travel budget." (Frausto Aff., Doc. 22-6, ¶ 11; Henson Dep., Doc. 22-5, 105:16–105:18 (acknowledging that she (Henson) had no money left in her travel account)) Henson does not controvert this evidence.

### 3. Legitimate, Nondiscriminatory Reasons

Even if Henson did establish a *prima facie* case of discrimination, TSC satisfies its burden to show legitimate, nondiscriminatory reasons for not renewing Henson's contract.

To meet its burden of producing a legitimate, nondiscriminatory reason for termination under the *McDonnell Douglas* framework, "an employer must articulate a nondiscriminatory reason with 'sufficient clarity' to afford the employee a realistic opportunity to show that the reason is pretextual." *Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 255 (1981)). "This burden is satisfied by introducing evidence which, if true, would permit the trier-of-fact to conclude that the termination was nondiscriminatory." *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001). "[A] purported reason that only comes to light after the decision to terminate has been made cannot be the real reason for termination." *Bennett v. Consol. Gravity Drainage Dist*. No. 1, 648 F. App'x 425, 430 (5th Cir. 2016) (citing *Burton v. Freescale Semiconductor, Inc.* 798 F.3d 222, 238 (5th Cir. 2015).

The Fifth Circuit has "repeatedly held that a charge of 'poor work performance' is [an] adequate [reason] when coupled with specific examples." *Burton,* 798 F.3d at 231 (concluding that poor work performance was a legitimate, nondiscriminatory reason for termination, for purposes of the Americans with Disabilities Act); s*ee also Feist v. Louisiana, Dep't of Justice, Office of Att'y Gen.*, 730 F.3d 450, 455 (5th Cir. 2013) (affirming summary judgment when defendant established that it based plaintiff's termination on her substandard work, and that the plaintiff "presented no evidence of pretext"); *Ramsey*, 238 F.3d at 684–85 (holding that the employer satisfied its burden of articulating a legitimate, nondiscriminatory reason for termination by asserting that plaintiff "was terminated because of his poor work performance and support[ing] this assertion with evidence of numerous instances of poor work performance as documented in [plaintiff's] personnel file.")

In the present matter, the summary judgment evidence establishes a lengthy series of concerns regarding Henson's job performance. (*See e.g.*, Frausto Aff., Doc. 22-6 (summarizing Henson's employment history at TSC); May 2017 Memo, Doc. 22-10 (compiling a list of student complaints against Henson); Spring 2017 Student Complaints, Doc. 22-11 (including complaints about Henson's grading, class administration, and her English-only policy); Oct. 2017 Notice, Doc. 22-13 (summarizing student complaints and listing expectations required of Henson); Fall 2017 Student Complaints, Doc. 22-14 (including complaints concerning Henson's timeliness and class administration); Jan 2018 Memo, Doc. 22-16 (detailing the issues in the CDEC program and requiring a joint PIP); CDEC PIP, Doc. 22-17 (including information about areas of improvement, goals, improvement strategies and progress checkpoints); Feb. 2018 Notice, Doc. 22-18 (summarizing concerns between Henson and Diaz and listing the expectations required of Henson); Henson PIP, Doc. 22-19 (including details regarding areas of improvement, goals, improvement strategies and progress checkpoints); Treviño Memo to Huerta, Doc. 22-24

(listing meetings between Treviño and Henson to discuss performance issues and student concerns)

TSC provided Henson opportunities to improve her performance, but ultimately concluded that she had not done so satisfactorily. (*See, e.g.*, Huerta Dep., Doc. 26-3, 15:16—16:25 ("Dr. Henson did not complete the PIP . . . She failed to meet the scheduled deadline for the fall schedule [or resolve] the communication issues with Ms. Diaz."); Frausto Aff., Doc. 22-6, ¶ 4 ("Documentation shows that both Ms. Diaz and Dr. Henson failed to meet ½ of the goals as per the Program Improvement Plan.")) Based on this evidence, TSC satisfied its burden to establish legitimate, nondiscriminatory reasons for not renewing Henson's contract.

In light of TSC's summary-judgment evidence, Henson bore the burden of demonstrating that TSC's articulated reasons for the nonrenewal of her contract were merely a pretext. To do so, Henson had to "provide some evidence, direct or circumstantial, to rebut each of the employer's proffered reasons and allow the jury to infer that the employer's explanation was a pretext for discrimination." *Rutherford*, 197 F.3d at 184. This burden is one of production, not persuasion, and can involve no assessment of credibility. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). "For an employer to be liable for discrimination under Title VII, the employee must establish not only that the employer's purported basis for termination was pretextual, but also 'that the real reason was intentional discrimination.'" *Bennett v. Consol. Gravity Drainage Dist.* No. 1, 648 F. App'x 425, 431 (5th Cir. 2016) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515–17); *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003); *see also Nasti v. CIBA Specialty Chemicals Corp.*, 492 F.3d 589 (5th Cir. 2007) (affirming summary judgment for defendant employer based on uncontroverted evidence that the decisionmaker based the termination decision on plaintiff's falsification of expense and call reports, precluding a fact issue as to pretext).

In her Response, Henson attempts to create a fact issue as to pretext by noting that TSC provided inadequate support for her to complete the individual or the CDEC PIP. (Response, Doc. 26, ¶ 14) But her reliance on TSC's alleged failure to provide adequate support does not controvert TSC's evidence regarding its belief that Henson performed poorly. Henson's position that she performed well at her job and that TSC provided inadequate support, by itself, does not show that TSC had discriminatory intent when not renewing her contract. Henson cannot merely disagree with the basis of TSC's decision, but must bring forth evidence of an unlawful motivation behind the adverse employment decision. She fails to do so.

### C. Hostile Work Environment Claim

To support a hostile work environment claim, the plaintiff must initially establish a *prima facie* case demonstrating that the alleged harassment was tied to a protected characteristic or activity. The elements of a *prima facie* case include that: "(1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based on a protected category; (4) the harassment complained of affected a term, condition or privilege of employment; [and] (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Brew v. Weyerhaeuser NR Co.*, 537 Fed. App'x 309, 313 (5th Cir. 2013) (citing *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 353 (5th Cir. 2001) *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110–115 (2002)); *Jones v. Flagship Int'l*, 793 F.2d 714, 719 (5th Cir. 1986) (adopting the Eleventh Circuit's "hostile work environment" paradigm).

In analyzing whether a hostile work environment exists, courts must consider: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift*, 214 F.3d 615, 625 (5th Cir. 2000). "Title VII is violated when the workplace is permeated with discriminatory intimidation, ridicule, and

insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Gardner v. CLC of Pascagoula, L.L.C.*, 915 F.3d 320, 325 (5th Cir. 2019) (internal quotation marks omitted); s*ee also Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) ("[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." (citation omitted)).

To satisfy Title VII, the work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citation omitted); *see also Frank v. Xerox Corp.*, 347 F.3d 130, 138 (5th Cir. 2003) ("The Plaintiffs must subjectively perceive the harassment as sufficiently severe or pervasive, and this subjective perception must be objectively reasonable.").  The "severe or pervasive" standard is a "'middle path between actionable conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury'".  *Gardner*, 915 F.3d at 325 (quoting *Harris*, 510 U.S. at 21) (concluding that "evidence of persistent and often physical harassment" of the plaintiff sufficed to create a fact issue as to a hostile work environment); *see also Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000) (concluding that evidence of consistent, highly-derogatory and racially-charged comments by co-workers and a supervisor precluded summary judgment for defendant as to a hostile work environment); *Ramsey v. Henderson*, 286 F.3d 264 (5th Cir. 2002) (affirming summary judgment for defendant because evidence of an employee yelling at the plaintiff, and a supervisor smiling as he ordered the yelling to stop, did not amount to discriminatory employment).

Henson alleges that during her employment with TSC, she was "criticized and treated with disdain after requesting that her colleagues and students speak in English in her presence rather than Spanish". (Compl., Doc. 1, ¶ 10)  She also testified that when she first began working

at TSC, one colleague (Diaz) asked Henson why she was in the program, and why they were working together. Henson believed the questions were racially motivated. (Henson Dep., Doc. 26-2, 80:2-81:1) When asked why she held that view, Henson replied, "Because I'm not the same [as] her. I'm not Hispanic." (*Id.* at 80:25-81:1) Another colleague told her, "I cannot work with you", which Henson also perceived as being racially motivated. (*Id.* at 81:6-25) And Henson testified that TSC ignored her complaints and that colleagues excluded her by speaking Spanish in meetings. (*Id.* at 55:17–56:7)

Viewing this summary judgment evidence in the light most favorable to Henson, the Court finds that as a matter of law, she has not established a *prima facie* case of a hostile work environment. The evidence on which Henson relies does not rise to the level of an abusive working environment. The alleged conduct was neither physically threatening nor humiliating. And on their face, the questions posed and comments made by Henson's colleagues are not objectively offensive. Henson testified that she perceived the statements as racially motivated, but absent additional information—which Henson does not provide—no reasonable person could find the statements hostile or abusive. In addition, based on the evidence that Henson submits, no reasonable juror could conclude that the alleged conduct unreasonably interfered with her work performance or surpassed merely-offensive conduct.[4]

Because Henson's summary judgment evidence fails to support her allegations of a hostile work environment, Henson has not created a *prima facie* case to survive summary judgement.

**D. Retaliation Claim**

In order to pursue a retaliation claim under Title VII, a plaintiff must establish a *prima facie* case showing: (1) that she engaged in activity protected by Title VII, (2) that an adverse

---

[4] Henson also alleges that TSC contributed to a hostile work environment by placing her on a PIP and not funding her participation in a conference. No court has concluded that such conduct suffices to create a hostile work environment. On the contrary, such actions by an employer are part and parcel of workplace decisions, and do not by themselves suggest racial or national-origin animus.

employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action. *Ackel v. Nat'l Communications, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003). With respect to the third element, the claimant "must establish that [her] protected activity was a but-for cause of the alleged adverse action." *Zamora v. City Of Houston*, 798 F.3d 326, 331 (5th Cir. 2015) (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). Protected activity" is defined as opposition to any practice made unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII. *Green v. Administrators of Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (Apr. 26, 2002) (citing 42 U.S.C. § 2000e–3(a)).

If the plaintiff satisfies her initial burden, an inference of discrimination arises, and the burden of proof shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment action. *See, e.g., Shackelford v. Deloitte & Touche*, LLP, 190 F.3d 398, 408 (5th Cir. 1999) (citing *McDonnell*, 411 U.S. at 801–803). "If the defendant satisfies this burden, the plaintiff must prove that the proffered reasons are pretextual." *Shackelford*, 190 F.3d at 404. To carry this burden, the plaintiff must rebut each nondiscriminatory or nonretaliatory reason articulated by the employer. *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).

The protected activity that Henson engaged in occurred on May 11, 2018—the day before her contract expired by its own terms—when she filed an internal grievance complaint with TSC, alleging discrimination. Eleven days later, on May 22, Huerta recommended that TSC not renew Henson's contract, and the TSC Board ultimately agreed with the recommendation in early July. Henson argues that TSC made its decision in retaliation to the Grievance Complaint that she filed, and that the temporal proximity between the two events creates a genuine issue of material fact on the matter. (Response, Doc. 26, ¶¶ 13–14)

Assuming, *arguendo*, that the temporal proximity between Henson's Grievance Complaint and TSC's decision to not renew her employment contract suffice to create a *prima facie* case of retaliation, Henson's claim still fails as a matter of law because she does not demonstrate that TSC's legitimate, nonretaliatory reasons for its decision was merely a pretext. TSC provided competent summary judgment evidence that its decision not to renew Henson's contract was based on its genuine belief that Henson was performing poorly in her role as a CDEC instructor. As summarized earlier, TSC issued Henson multiple warnings regarding her job performance, and ultimately placed her on the CDEC PIP as well as an individual PIP. Henson's supervisors concluded that she had not completed the PIPs successfully. This evidence satisfied TSC's burden to establish nonretaliatory reasons for the decision at issue.

In reply, Henson only argues that TSC did not provide her with adequate support to complete the PIPs. Such evidence—accepting it as true for purposes of considering the Motion for Summary Judgment—does not demonstrate that TSC's legitimate, nondiscriminatory reasons to not renew Henson's contract were pretextual, that the Grievance Complaint was a but-for cause behind the Board's decision. Henson provides no authority indicating that an employer's termination of an employee for poor job performance is considered pretextual solely because the employer does not provide a threshold level of support to the employee. On the contrary, the Fifth Circuit has concluded that an employer's failure to meet with an employee to set performance goals does not demonstrate that the employer's decision to terminate the employee for poor job performance amounts to mere pretext. *See Perez v. Region 20 Education Servs. Center*, 307 F.3d 318, 325 (5th Cir. 2002) ("Such a failure may be a management lapse, but it does not amount to evidence of retaliation.").

Likewise, courts have regularly concluded that employers may rely on an employee's poor job performance to make work-related decisions that negatively impact the employee. *See, e.g., Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 220 (5th Cir. 2016) (affirming summary

judgment for the employer in part because the employee's "documented performance issues provide[d] a reasonable basis to deny [the employee a] 'merit adjustment raise'"). In cases in which courts have found that a jury issue existed as to pretext, the plaintiffs relied on evidence raising doubts as to the employer's reliance on the alleged poor job performance. *See, e.g., Shackelford*, 190 F.3d at 409 (concerning an employee who was told by several colleagues that if he "want[ed] to keep [his] job", he should not engage in protected activity, and submitting evidence that the employer did not give poor performance reviews to similarly-situated employees); *Long v. Eastfield College*, 88 F.3d 300, 304 n.4 (5th Cir. 1996) (involving an employee whose job performance evaluations had been positive up until the employee engaged in protected activity). Henson provides no such summary judgment evidence.

As a result, Henson has failed to satisfy her burden to create a genuine issue of material fact as to whether TSC's legitimate, nondiscriminatory reasons for not renewing her contract were pretextual.

## III. Conclusion

For these reasons, it is:

**ORDERED** that Defendant Texas Southmost College's Motion for Summary Judgement (Doc. 22) is **GRANTED**; and

**ORDERED** that Plaintiff Ronilda C. Henson's causes of action against Defendant Texas Southmost College are **DISMISSED WITH PREJUDICE**.

SIGNED this 30th day of January, 2020.

_____
Fernando Rodriguez, Jr.
United States District Judge